## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**Dr. DELORA MOUNT**                              **CIVIL ACTION**

                                                 **JURY TRIAL DEMANDED**

**VERSUS**

**LOUISIANA STATE UNIVERSITY HEALTH
SCIENCES CENTER, through the BOARD OF
SUPERVISORS OF LOUISIANA STATE UNIVERSITY
AND AGRICULTURAL AND MECHANICAL COLLEGE,
and LOUISIANA CHILDREN'S MEDICAL CENTER (d/b/a
CHILDREN'S HOSPITAL NEW ORLEANS / MANNING
FAMILY CHILDREN'S)**

### FIRST AMENDED COMPLAINT

1.      Plaintiff Dr. Delora Mount is a national expert in craniofacial and pediatric plastic surgery, including the repair of cleft lip and palate birth defects and other congenital and traumatic facial abnormalities in children and infants.

2.      For two decades, Dr. Mount was a Professor of Surgery and Pediatrics and the Chief of Pediatric Plastic Surgery at the University of Wisconsin. In 2021, LCMC Health recruited Dr. Mount to move to Louisiana to work at Children's Hospital New Orleans, serving in dual role: an administrative role as Section Chief of Pediatric Plastic Surgery at Children's and a clinical role as a surgeon, with faculty duties at LSUHSC. Dr. Mount began her new job in the summer of 2022.

3.      Dr. Mount was happy in Wisconsin, but she felt inspired by the opportunity to contribute to the Gulf South – a community that was particularly underserved by doctors of Dr. Mount's specialty.

4.      One key aspect of the recruitment was that Defendants wanted Dr. Mount to mentor Dr. Masoumy, a younger male colleague who had completed his clinical fellowship just two years prior. But Defendants did not disclose to Dr. Mount that at times during her employment,

1

Dr. Masoumy would be paid more than her – and then promoted over her – despite being less experienced and trained in leadership and management.

5.      For example, in FY 2023, Defendants paid Dr. Mount $61,000 less than Dr. Masoumy – even though she had *eighteen-years'* more experience than him.

6.      Then, in the summer of 2023, Dr. Mount injured her hand and wrist during a fall caused by an ongoing herniated disc and nerve compression in her leg. The wrist injury required surgery to repair, and the underlying spinal issue required another surgery and medical leave.

7.      On January 5, 2024, Defendants approved Dr. Mount for FMLA leave for her final surgery. Three days later, on January 8, 2024, Dr. Mount was handed a dismissal letter which stated that "you are hereby given notice that your appointment will not be renewed." The letter said that Dr. Mount's last day would be July 9, 2024.

8.      Then on March 17, 2024, Dr. Mount updated her employers that she was going to be cleared to return to work in April. That same day, Defendants emailed Dr. Mount to tell her that she was being placed on administrative leave with no return date before the end of her contract. They gave no explanation other than that they "wanted to give [her] enough recovery time".

9.      What happened to Dr. Mount was immoral and illegal. But unfortunately, it wasn't unusual. The year before Dr. Mount was hired – and unknown to Dr. Mount – an internal audit of LSUHSC-New Orleans found major problems with LSUHSC's employment policies, particularly involving differential treatment of men and women.[1]

10.     One whistleblower said she was "an eyewitness to unethical decisions made by an administration whom I have heard state carte blanche 'can do anything they want to do.'" The

---

[1] LSU Office of Internal Audit, *Memorandum of Internal Investigation re: Investigation of Alleged Conflicts of Interest, Favoritism, Nepotism, and Retaliation by LSUHSC-NO Administration* (Sept. 14, 2021), incorporated by reference herein and available online at https://tinyurl.com/45jj4wxb.

whistleblower specifically reported that LSUHSC's "promotions and hiring practices" did not "align with EEOC requirements."[2]

11.    Following the loss of her position at Children's / LSUHSC and after a period of unemployment, Dr. Mount found a position as a surgeon and professor at the UNC School of Medicine in North Carolina.

12.    But Louisiana's children feel her absence. With the loss of Dr. Mount, there is now only <u>one doctor in the entire state of Louisiana</u> who offers certain kinds of reconstructive surgery for children.[3]

13.    It is wrong for the children of Louisiana to be the collateral damage of Defendants' misconduct. There must be accountability. Accordingly, Dr. Mount brings this suit.

## I.    JURISDICTION AND VENUE

14.    This Court has jurisdiction over Plaintiff's claims under Title VII of the Civil Rights Act of 1964, the Equal Pay Act, the Americans with Disabilities Amendments Act, the Age Discrimination in Employment Act, and the Family and Medical Leave Act, pursuant to 28 U.S.C. §§ 1331, 1343(a)(3).

15.    This Court also has federal diversity jurisdiction over this matter under 28 U.S.C. § 1332 as the Plaintiff is a citizen of a different state than all Defendants and the amount in controversy exceeds $75,000.00.

16.    This Court has jurisdiction over Plaintiff's state law claims in accordance with 28 U.S.C. § 1367.

17.    The venue is proper in the Eastern District of Louisiana under 28 U.S.C.

---

[2] *Id.* at 43.
[3] See  https://www.lsuprsresidency.com/faculty  ("presently the only reconstructive surgeon to offer microtia reconstruction in the entire state of Louisiana.")

§1391(b)(2) because the events giving rise to the claim occurred in the Eastern District of Louisiana.

## II.    PARTIES

18.    Plaintiff **Dr. Delora Mount** is a person of the full age of majority maintaining a residence in North Carolina. At the relevant times, she lived in New Orleans, Louisiana.

19.    Defendant **Louisiana State University Health Sciences Center** ("LSUHSC"), sued through the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, is a public entity.[4] Because LSU Health is an institution of postsecondary education under the control of the LSU Board, the Board is the proper defendant in a suit alleging misconduct by LSUHSC.[5]

20.    Defendant **Louisiana Children's Medical Center**, d/b/a LCMC Health is a non-profit health system operating as an Organized Health Care Arrangement under Louisiana law. It is a nonprofit network of health care providers, which operates nine hospitals and a number of other locations in Louisiana and Mississippi. Its principal place of business is 1100 Poydras Street, New Orleans, Louisiana 70163. It owns and operates Children's Hospital New Orleans ("CHNOLA" or "Children's Hospital").

---

[4] Specifically, Louisiana Revised Statutes Section 17:3215 lists "institutions under the supervision and management" of the LSU board. La. Rev. Stat. § 17:3215 (2011). These include "Louisiana State University Health Sciences Center at New Orleans, which shall include medical and related health schools and programs located in New Orleans." *Id.*; see also La. Rev. Stat. § 17:1519.5 (2010) ("The [LSU B]oard as a body corporate shall have authority to exercise all power to direct, control, supervise, and manage [LSU Health].").
[5] *See* La. Rev. Stat. § 17:3351(A)(1) (granting the LSU Board authority to "sue and be sued" on behalf of "institutions of postsecondary education under its control").

### III.    FACTS

**A.    Defendants' Recruitment and Hiring of Dr. Mount, a National Craniofacial and Pediatric Plastic Surgery Expert.**

21.     Dr. Delora Mount is a national and international expert in craniofacial and pediatric plastic surgery.

22.     Prior to working for Defendants, Dr. Mount was a Professor of Surgery and Pediatrics and the Chief of Pediatric Plastic Surgery at the University of Wisconsin for nearly twenty-one years.

23.     Dr. Mount has also served as the President of the Pediatric Plastic Surgery Section of the American Academy of Pediatrics, a board member, president, and vice president for the American Society of Maxillofacial Surgeons, a board member of AO CMF (AO Craniomaxillofacial Surgery), a member of the FDA's General Plastic Surgery Panel of the Medical Devices, and a member of the advisory committee for their Center of Devices and Radiological Health, and has held other leadership positions with the American Board of Plastic Surgery and the American Cleft Palate Craniofacial Association.

24.     Dr. Mount was happy in Madison, Wisconsin where, in addition to her professional accomplishments, she was raising her son and was an active member of the community.

25.     In 2021, Defendants recruited Dr. Mount to come to Louisiana and work at Children's Hospital New Orleans.

26.     Dr. Mount had no plans to leave Wisconsin prior to Defendants' 2021 recruitment effort, but she was inspired by the opportunity to contribute to the Gulf South community, which she knew could benefit from her expertise and where she could grow from tackling the unique challenges of the position.

27.     But it was no small thing to pick up and move her family during the height of the COVID-19 pandemic.

28.     As a result, Dr. Mount put a tremendous amount of time and research into reaching the decision to uproot her life and put her family through a major transition.

29.     She was unaware, however, of the 2021 audit results and history of malfeasance.

30.     One key aspect of Children's Hospital's recruitment of Dr. Mount was that the hospital wanted her to mentor Dr. Mohamad Masoumy, who at that time was only two years removed from completing his clinical fellowship.

31.     Dr. Mount was specifically asked to help Dr. Masoumy with his surgical confidence, performance, and efficiency, and to mentor him and support him in complex craniofacial reconstruction.

32.     But Defendants did not disclose to Dr. Mount that during times of her employment, Dr. Masoumy would be compensated at a higher rate than her.

33.     On December 2, 2021, after a lengthy recruitment by Children's Hospital, Defendants offered Dr. Mount a position as Professor of Clinical Surgery, Section Chief of Pediatric Plastic Surgery and Director of the Cleft Palate and Craniofacial Center at CHNOLA.

34.     On December 9, 2021, Dr. Mount accepted Defendants' offer of employment.

35.     At the time of her hire, CHNOLA's then-Surgeon-In-Chief announced in a press release: Dr. Mount "is an accomplished leader in the field of craniofacial and pediatric plastic surgery. She will add considerable experience to our talented interdisciplinary team. … We are thrilled that she has chosen to contribute her talent and passion to the children and families of Louisiana and the Gulf South."

**B.      Relationship Between Dr. Mount, LCMC Health, and LSUHSC**

36.     The relationship between Dr. Mount, LSUHSC, and LCMC Health/CHNOLA was complex.

37.     LCMC Health employs physicians and staff. To fill additional staffing needs, LCMC Health's Children's Hospital entered into a services agreement with Louisiana State University Health Sciences Center New Orleans ("LSUHSC").

38.     Under this services agreement, LSUHSC agreed to provide physicians to fill certain needs at Children's Hospital.

39.     LSUHSC admits it employed Dr. Mount.

40.     LCMC Health has denied any employment relationship with Dr. Mount or Dr. Masoumy, but the facts show otherwise.

41.     In fact, LCMC Health, through CHNOLA, had an oral agreement with Dr. Mount to work as a physician at the Children's Hospital in exchange for pay.

42.     The existence of that agreement is corroborated by facts including the following:

43.     LCMC Health, through CHNOLA, was the entity that recruited Dr. Mount for employment.

44.     LCMC Health/CHNOLA undertook all of Dr. Mount's recruitment and recruitment expenses.

45.     LCMC Health/CHNOLA made all communications with Dr. Mount about the hire (email, phone calls, card from CEO welcoming her as a new hire).

46.     LCMC Health/CHNOLA paid for all of Dr. Mount's recruitment-related hotels, hospitality, and air travel.

47.     LCMC Health/CHNOLA negotiated Dr. Mount's signing bonus.

48.     CHNOLA directly paid Dr. Mount's signing bonus as follows:



49.     If CHNOLA had no contractual employment relationship with Dr. Mount, it would

not have directly paid her a $30,000.00 signing bonus.

50.     CHNOLA leaders, specifically the Surgeon-in-Chief, Dr. Ellis Arjmand, who

reported to Lou Fragoso (CFO) and John Nikkens (CEO), were the primary decision-makers in

Dr. Mount's hiring and handled and all salary negotiations.

51.     No conversations or input in Dr. Mount's hiring were from LSUHSC.

52.     LCMC/CHNOLA brought LSUHSC in at the last minute when LCMC Health was

putting together Dr. Mount's offer.

53.     At the time of the offer, LCMC Health/CHNOLA told Dr. Mount that it was really

for the best that her employment be routed through LSUHSC because it brought prestige and a

faculty position to her position and role, even though she really worked at CHNOLA.

54.     LCMC Health/CHNOLA retained supervision and control over the doctors, even

though the formal contract was between the doctor and LSUHSC.

55.     For example, LCMC Health controlled many aspects of Dr. Mount's job, including

but not limited to:

      i.   Number of clinics per week;

     ii.   Timing of patient's appointments, including a mandated grid of

         appointment times;

iii.   Call schedule;

iv.   Administrative meeting schedule;

v.   Office space location in LCMC/CHNOLA building;

vi.   Parking space in LCMC/CHNOLA parking lot;

vii.   Vaccination schedule and requirements through LCMC/CHNOLA employee health;

viii.   Transportation reimbursement for outreach clinics;

ix.   Office computer (not compatible with LSU system);

x.   Clinical billing (headcount) and surgical billing;

xi.   RVU calculations and assessments;

xii.   Business manager oversight;

xiii.   Operating room schedule;

xiv.   Business expense allowance, set by LCMC and directed to LSU implementation;

xv.   EPIC training and onboarding requirements;

xvi.   Expansion project/clinical site development (*i.e.,* Dr. Mount's administrative duties);

xvii.   Lunch write-offs for cafeteria expense on craniofacial clinic days;

xviii.   Oversight for operating room expenditures/improvements/equipment purchases;

xix.   Business card supply for Children's Hospital of New Orleans (Dr. Mount had no LSU-specific business cards);

xx.   Advertisement of Dr. Mount's hiring by CHNOLA;

xxi.   Office supply purchases, including furniture, white-board and iPad.

xxii.    Badge access specific to CHNOLA;

xxiii.   Billing E/M codebooks, CPT manuals and ICD-10 manuals were purchased for Dr. Mount's financial support/billing accuracy by CHNOLA;

xxiv.    Clinical scribe service;

xxv.     Dr. Mount's direct day-to-day supervision was by Surgeon-in-Chief Dr. Arjmand, and Business Administrator Michelle Botello;

xxvi.    Both Dr. Arjmand and Michele expressed that they were independently Dr. Mount's "boss";

xxvii.   Dr. Mount was credentialed only through CHNOLA;

xxviii.  She never received hospital credentials for other LSU affiliates. Dr. Mount could only operate and see clinical patients through CHNOLA or CHNOLA's affiliate in Baton Rouge;

xxix.    Dr. Mount was told by LSU's business office that her personal employment files were "at Children's Hospital";

xxx.     Furthermore, LCMC Health had the ability to make decisions about doctor compensation, although the money was routed through LSUHSC; and

xxxi.    For example, in 2022, LCMC Health's CHNOLA decided to award Dr. Masoumy an additional supplemental incentive compensation of $100,000 over a five-month period. The additional amount was paid through LSUHSC but funded by LCMC Health's CHNOLA.

56.    Although Dr. Mount's contract was through LSUHSC, during her employment, LSUHSC provided no office space, no administrative support, no nursing support, and no day-to-day oversight over her employment.

57.     Thus under the joint/dual employer doctrine and/or the doctrine of the borrowed servant, Dr. Mount was an employee of both Defendants.

58.     At all relevant times, both LSUHSC and LCMC Health (through CHNOLA) were Dr. Mount's employers under all of the relevant laws (Title VII, EPA, ADAA, LEDL, FMLA, etc.).

**C.     Dr. Mount's Employment and Defendants' Promotion of Dr. Masoumy Over Her.**

59.     Dr. Mount began work at CHNOLA in June 2022.

60.     Her hire date was June 1, 2022 and she began clinical duties on June 16, 2022.

61.     Dr. Mount's appointment was for an initial two-year period, with the expectation that it would be renewed.

62.     As CHNOLA's Service Line Chief, Dr. Mount was responsible for performing clinical services, including scheduling and performing surgeries and scheduling and performing outpatient clinics. and reconstructive surgery at CHNOLA.

63.     Dr. Mount worked for Defendants for two years, during which time she made substantial contributions to the hospital and her field of expertise, including but not limited to:

   i.   Starting and expanding outreach clinics for pediatric plastic surgery in Baton Rouge;

   ii.  Overseeing CHNOLA's cleft lip and palate clinics and expanding development of services and oversight of medically complex infants and children;

   iii. Developing and instructing in a new multidisciplinary series at CHNOLA that provided an opportunity for collaboration between clinics/wards/OR/satellite clinics, pediatric plastic surgery faculty, and residents;

11

    iv.  Expanding services and setting standard protocols for treatment of neonates with micrognathia, causing airway obstruction, becoming a regional referral source for this procedure and significantly increasing the number of procedures performed, all with safety and successful outcomes;

    v.  Expanding CHNOLA's capacity for treatment of congenital breast deformity of macromastia, responding to a significant unmet need for life-changing breast reduction surgery in teens in Louisiana;

    vi.  Mentoring two scientific studies of use of mandibular distraction in medically fragile newborns with extremely rare syndromes; and

    vii.  Serving as faculty, keynote speaker, and moderator in national and international courses and events relating to pediatric plastic surgery and serving as Senior Board Examiner for the American Board of Plastic Surgery (ABPS), helping to raise CHNOLA's profile and reputation nationally and internationally in surgery, plastic surgery, and pediatric plastic surgery.

64.    Dr. Mount also successfully mentored junior partners, including Dr. Masoumy and Dr. Lavie, with complex craniofacial reconstruction, as CHNOLA had emphasized in the recruitment process, as well as mentoring Dr. Masoumy in networking nationally and supporting him in major leadership and association inclusion.

65.    During their period of mutual employment, both Dr. Mount and Dr. Masoumy performed the following clinical duties at CHNOLA:

    i.  Perioperative care of plastic surgery patients;

    ii.  Surgery on pediatric patients with complex plastic surgical needs;

    iii.  Consultation service for ED/ NICU (and other inpatient units) and OR;

    iv.  Outpatient clinics staffing – pediatric plastic surgery;

     v.   Craniofacial clinics staffing – cleft (rotating);

    vi.   Craniosynostosis clinic staffing (rotating);

   vii.   On-call duties for pediatrics plastic surgery (rotating);

  viii.   On-call duties for facial trauma (rotating); and

    ix.   Other clinical duties;

66.    In addition, during their period of mutual employment, both Dr. Mount and Dr. Masoumy performed a variety of administrative duties at CHNOLA, with Dr. Mount performing more significant administrative duties than Dr. Masoumy.

67.    Dr. Mount served as CHNOLA's Service Line Chief, Pediatric Plastics & Craniofacial, served as the Co-Director of Cleft and Craniofacial Clinics, and served on the Surgical Services committee and the Laser subcommittee.

68.    Dr. Masoumy served as the LSU Assistant Program Director (Residency).

69.    In November 2023, Defendants promoted Dr. Masoumy over Dr. Mount to the position of LSUHSC's Interim Chief of the Division of Plastic and Reconstructive Surgery.

70.    Defendants made this promotion without any formal application process.

71.    Defendants promoted Dr. Masoumy despite the fact that Dr. Mount was qualified for the position.

72.    Defendants promoted Dr. Masoumy despite the fact that Dr. Mount had served in multiple leadership roles and leadership courses at Harvard and Penn, and Dr. Masoumy had not.

73.    Defendants promoted Dr. Masoumy despite the fact that Dr. Mount had on numerous occasions emphasized her interest in higher leadership positions.

74.    Defendants promoted Dr. Masoumy despite the fact that Dr. Mount had significantly more experience in plastic and reconstructive surgery and more significant administrative responsibilities at the hospital.

75.    LSUHSC has contended that Dr. Masoumy "was not promoted at all" because it was a "temporary assignment."

76.    But in reality, he was promoted.

77.    Dr. Masoumy was appointed as the Interim Chief of the Division of Plastic and Reconstructive Surgery in November 2023 and held that position for a year and a half until recently being replaced.

**D.    Dr. Mount's Injury, FMLA Leave, Termination, and Administrative Leave**

78.    On June 17, 2023, Dr. Mount fell and fractured her dominant hand/wrist.

79.    The fall was caused by her insensate foot and intermittent dropfoot, both symptoms of spinal issues dating back to 2020.

80.    Dr. Mount took a brief sick leave to undergo surgery and quickly returned to work.

81.    However, between June and November 2023, she continued to experience ongoing symptoms relating to her spinal issues and learned that she would need an additional spinal surgery.

82.    Dr. Mount had also dealt with migraines off and on during her life, typically brought about by stress. Her migraines caused pain, nausea, and visual impairment.

83.    In mid-2023, Dr. Mount's migraines returned.

84.    As a result, she had to reschedule two surgeries on short notice and reschedule some clinic appointments.

85.    Defendants had knowledge throughout the summer of 2023 of Dr. Mount's medical issues and had knowledge in November 2023 that Dr. Mount would need spinal surgery and a longer medical leave.

86.    After Dr. Mount was injured and took leave for her first surgery, Children's Hospital says it reported concerns about her appointment scheduling to LSUHSC.

87.    Children's Hospital says, however, it "did not request or suggest" that Dr. Mount be removed from the hospital.

88.    After her first surgery, Dr. Mount continued full time clinical duties (clinic staffing, on-call coverage and administrative duties with her wrist in a cast), with the exception of performing surgery for about six weeks.

89.    She returned to full duties including operating at six weeks post-injury.

90.    Dr. Mount formally notified Defendants by email on December 1, 2023 that she would require FMLA leave for the spine surgery, beginning January 15, 2024.

91.    The leave was approved on January 5, 2024.

92.    But while the request was still pending, Dr. Masoumy assigned Dr. Mount extra on-call duties, which he admitted was <u>because</u> she was going to be on medical leave.

93.    When Dr. Mount raised concerns about the on-call schedule, Dr. Masoumy responded by specifically citing her upcoming surgery and FMLA leave and the amount of time that she needed to recover from her prior spinal surgery (prior to her employment at CHNOLA).

94.    On January 8, 2024, Defendants called Dr. Mount to a "serious" and "very, very important" meeting with LSUHSC Associate Interim Dean Dr. Stephanie Taylor and LSUHSC HRM's Leila McConnell.

95.    At the January 8 meeting, Defendants informed Dr. Mount that her contract would not be renewed and that the non-renewal was without cause.

96.    Also at that meeting, Defendants handed her a dismissal letter which stated, in part, that "you are hereby given notice that your appointment will not be renewed. Therefore, your last day of employment is July 8, 2024, with a separation date of July 9, 2024."

97.    At that meeting, Dr. Taylor admitted that the timing of the dismissal was unfortunate on light of Dr. Mount's upcoming medical leave.

98.     At that meeting, Dr. Taylor stated something to the effect that "we ran it by legal and everything is okay."

99.     At that meeting, Dr. Taylor also indicated that there were a lot of people who were part of the decision, such as Dr. Mark Kline (Senior Vice President, Physician-in-Chief and Chief Medical Officer, CHNOLA), Dr. Valentine Nfonsam (Chair, LSUHSC Department of Surgery), and Dr. Richard DiCarlo (Interim Dean, LSUHSC School of Medicine), among others.

100.    While Dr. Mount attended the January 8, 2024 dismissal meeting in person, the meeting was also recorded by Zoom.

101.    The meeting was not attended by any LSU faculty, or LCMC representatives.

102.    The meeting was in the executive suite of CHNOLA offices.

103.    Defendants never provided Dr. Mount with a copy of that Zoom recording, despite her requests for that recording.

104.    On information and belief, Dr. Taylor was not telling the truth about who endorsed the decision to fire Dr. Mount.

105.    In a later conversation that Dr. Mount had with a CHNOLA administrator about the reasons for her dismissal, he noted that there had been a lot of talk about Dr. Mount "being sick and cancelling clinics/surgery."

106.    Defendants' explanation was that they had actually decided to terminate Dr. Mount in November 2023, but just didn't tell her until after Christmas to "be kind."

107.    But that is *extremely* implausible, especially because LSUHSC's policies required six-months' notice before contract termination.

108.    As a result, after terminating Dr. Mount in January 2024, Defendants had to pay Dr. Mount through July 2024.

109.    But if they had told Dr. Mount in November when they supposedly made the decision, they would not have had to pay her for June and July 2024.

110.    It is extremely implausible that Defendants spent more than $80,000 to "be kind" and wait until after Christmas to tell Dr. Mount that she was fired – but then tell her right before her surgery.

111.    Dr. Mount underwent successful spinal surgery on January 17, 2024.

112.    She planned to fully return to work following her medical leave and did not anticipate any residual issues which would impact her ability to do her job, once recovered (and in fact, following separation from Defendants, she has resumed her successful surgical career at the University of North Carolina-Chapel Hill).

113.    Dr. Mount remained in regular contact with Defendants throughout her FMLA leave and recovery, including regarding her anticipated return to work.

114.    On March 17, 2024, Dr. Mount informed Defendants that she had an appointment with her surgeon on April 8 and was likely to be cleared to return to work on April 9.

115.    But that same day (March 17, 2024), Dr. Taylor emailed Dr. Mount to inform her that she was being placed on administrative leave with no return date before the end of her contract.

116.    Dr. Mount was shocked by this news, even believing that it must have been an administrative error, and requested additional information.

117.    Dr. Taylor responded that "[t]hroughout the day I have had the opportunity to talk with Drs. Nfonsam, Kline and Ms. McConnell (LSU HR). Dr. Kline also talked to Dr. Masoumy. I also confirmed with all parties that this was the plan before you went on leave" and that they "were very concerned about your safety and wanted to give you enough recovery time."

118.    Dr. Taylor also stated that the administrative leave letter "could not be issued until your sick leave/FMLA was completed."

119. Dr. Mount's FMLA leave was *still ongoing* at that time.

120. And Dr. Mount had never been informed of this "plan" prior to March 17, 2024.

121. Indeed, when Dr. Mount received this news, she already had surgeries scheduled for after her planned return to work.

122. Further, Dr. Masoumy had scheduled her for on-call duties for after her return to work.

123. When Dr. Masoumy received Dr. Taylor's email regarding Dr. Mount's administrative leave, he responded by stating that that plan was not communicated to him by LSU or Children's Hospital.

124. Dr. Masoumy said that coordinators had not been informed of this to make appropriate arrangements for patients.

125. In particularly, surgery business manager Leti Borrouso had not informed – and did not learn about Dr. Mount's dismissal until after the dismissal.

126. Dr. Mount was devastated by Defendants' decision to abruptly end her employment and prevent her from continuing to serve her patients and by the misrepresentations made throughout the FMLA process.

127. Dr. Mount was terminated and placed on administrative leave despite LSUHSC admitting that she "did not commit any offenses and was not disciplined."

128. With the exception of the issues with compensation and promotion, Dr. Mount enjoyed and valued her time at CHNOLA/LSUHSC and had planned to spend the rest of her career there.

129. Instead, she not only had to uproot her family and career for the second time in three years, but also suffered substantial non-monetary damages in addition to significant monetary damages.

130.    It was particularly difficult because Defendants had recruited her to leave her longtime personal and professional home in Wisconsin and come to Louisiana – where they proceeded to pay her less than her less-qualified male colleague and then fire her once they learned of her medical issues and need for medical care.

131.    Defendants never provided Dr. Mount with an administrative leave letter.

132.    Since the end of her employment with Defendants, Dr. Mount has not had her migraines return.

133.    Dr. Mount timely filed two EEOC charges alleging discrimination based on age, sex, and disability and retaliation; one against LSUHSC and one against CHNOLA.

134.    Dr. Mount was sent a Right to Sue letter dated June 5, 2025 for EEOC Charge No. 461-2024-03164 and a Right to Sue letter dated June 10, 2025 for Charge No. 461-2024-02827.

135.    Dr. Mount has satisfied her requirement to exhaust administrative remedies and this Complaint is timely filed within ninety days of her receipt of the Notices of the Right to Sue.

**D.    Internal Audits and Whistleblowers Confirm LSUHSC's Equal Employment Failures.**

136.    In a September 14, 2021 Memorandum of Internal Investigation, LSU's Office of Internal Audit concluded that the organization's equal employment opportunity policies were inadequate.

137.    The September 2021 audit also found major failures related to oversight and fairness of compensation.

138.    The audit concluded that "[m]ultiple revisions to Board policy and PM-69: *Delegation of Authority to Execute Personnel Actions* since 2014 have resulted in minimal requirements for Board or Presidential approval."[6]

---

[6] Sept. 2021 LSU Audit, *supra*, at 3.

139.    It said that "Human Resources Management Office (HRM) employees have since reported being told by the LSUHSC-NO administration repeatedly that PM-69 gave them 'carte blanche' authority for personnel actions."[7]

140.    The audit also concluded that the "University does not have a comprehensive compensation policy. The combination of the broad authority granted to the Chancellor and the lack of a comprehensive compensation policy was cited by multiple employees in the HRM at LSUHSC-NO, including the Director, as the most significant impediment to their ability to exercise meaningful control over personnel actions."[8]

141.    The audit concluded that the "LSUHSC-NO Chancellor's Memorandum (CM) 10" – which addresses hiring and employment – "materially fails to meet the minimum requirements" of the University's broader memorandum on equal employment in hiring.

142.    It further concluded that some of LSUHSC-NO's employment processes lacked "integrity" and that LSUHSC-NO leaders used "additional compensation" for certain favored employees "in part, to avoid additional oversight and in violation of University policy."[9]

143.    The audit also corroborated differential treatment of men and women.

144.    For example, one male applicant applied for the role of Compliance Officer. When his application was initially rejected because he did have an active Louisiana State Bar License, he was told to reapply and his application could proceed even without an active license.[10]

145.    But a female applicant was treated differently. She also appeared to be "well-qualified" and "met all stated requirement except for a license to practice law in Louisiana."[11]

---

[7] *Id.*
[8] *Id.*
[9] *Id.* at 4.
[10] *Id.* at 38.
[11] *Id.* at 40.

146.    But unlike the male applicant, internal auditors concluded that she "appeared to have been disqualified solely for not meeting the exact minimum requirement that disqualified [the male applicant]: possession of an 'active Louisiana State Bar License.'"[12]

147.    The auditors concluded that it did not appear that she "received the same opportunity for exception afforded to" the male applicant.[13]

148.    Ultimately, the male applicant got the job; the female applicant was not even allowed to participate in the process.

149.    The audit also reflected that a LSUHSC-NO human resources employee reported that she was an "eyewitness to unethical decisions made by an administration whom I have heard state carte blanche 'can do anything they want to do.' As a Human Resources professional, I have found myself in almost constant situations where I've been faced with the decision to go along with the administration's desires or follow ethical best practices."[14]

150.    Notably, she reported that LSUHSC's "promotions and hiring practices" did not "align with EEOC requirements."[15]

151.    The problems in the 2021 internal audit were corroborated by an extensive range of complaints of gender discrimination involving LSU and particularly the LSUHSC. For example:

A.    In 2019, a pair of top lawyers, including LSUHSC's general counsel at the time, filed suit regarding the chancellor's "years-long" practice of discriminating against women.[16] That included paying them salaries that are tens of thousands of dollars less than what the administration pays their male counterparts, the lawsuit alleged.

---

[12] *Id.*
[13] *Id.*
[14] *Id.* at 43.
[15] *Id.*
[16] Josephy Cranney, *Before other improprieties surfaced, LSU Health employees alleged harassment, discrimination*, Times-Picayune Advocate (Sep. 23, 2021).

They cited a 2017 pay study that showed, among other findings, that by one measure the median salary for top administrators exceeded that for women by almost $70,000, according to the lawsuit.

B.  Less than six months later, a female LSU Health director made similar allegations in another complaint filed in federal court in New Orleans. That case was settled for an undisclosed amount.[17]

C.  Around the same time, another LSUHSC employee described gender-based harassment and discrimination, and then retaliation once she reported her concerns.[18]

D.  In April 2021, seven women filed a federal lawsuit against LSU, alleging that the university violated Title IX and "repeatedly engaged in discriminatory, retaliatory, and other unlawful actions" when the women tried to report sexual misconduct on campus.[19]

E.  In May 2021, four LSUHSC employees went public with claims they were continually discriminated against during their time at LSUHSC. They called for the removal of the LSUHSC chancellor, who they allege mishandled their complaints about discrimination and engaged in retaliation himself.[20]

F.  Another independent investigation by Husch Blackwell resulted in a 150-page-long report concluding that the university had failed to properly report and investigate allegations of sexual misconduct.

---

[17]*Id.*

[18]*Id.*

[19]James Wilkins, *50 years of Title IX: A look at LSU's recent history with anti-sex discrimination law*, Times-Picayune Advocate (June 19, 2022).

[20]Dan Jovic, Carolyn Roy, *4 women go public with details of discrimination, retaliation complaints against LSUHSC medical school chancellor*, KTAL News (May 5, 2021).

## IV.    CLAIMS

### Count 1: Title VII of the Civil Rights Act of 1964
### *Against all Defendants*

152.    Dr. Mount incorporates by reference all other paragraphs of this Complaint as if fully set forth here.

153.    Title VII of the Civil Rights Act bars sex discrimination in the workplace.[21]

154.    It is unlawful for an employer "to fail or refuse to hire or to discharge any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."[22]

155.    Here, Defendants denied Dr. Mount the opportunity for a promotion, paid her less than a male colleague, terminated her contract, and placed her on administrative leave due to her sex.

156.    This discrimination is evidenced in part by comparison to Defendants' treatment of Dr. Masoumy, a male colleague with eighteen-years' less experience than Dr. Mount.

157.    Defendants also retaliated against Dr. Mount for reporting and opposing discrimination on the basis of sex.

158.    In a July 2023 performance review of a subordinate, Dr. Mount reported inappropriate behavior including disparaging comments by employee M.B. regarding a colleague taking a maternity leave.

159.    On July 17, 2023, Dr. Mount sent an email to Sonia Carter, the Director of Ambulatory and Social Services, that Dr. Mount had concluded the performance review of employee M.B.  In the email, Dr. Mount noted it was "unfortunately not positive reviews" and offered to provide "more granular examples or additional comments."

---

[21] Civil Rights Act of 1964, § 701 *et seq.*, as amended, 42 U.S.C.A. § 2000e *et seq.*
[22] 42 U.S. Code § 2000e–2; *see also Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488 (M.D.La. 2003).

160.    Dr. Mount detailed the disparaging M.B.'s comments in a Google survey that was sent on July 20, 2023.

161.    Dr. Mount reported that M.B. had made derogatory comments about a particular physician's assistant's maternity leave, and then declined to allow that assistant extra time off for the maternity leave. Specifically, M.B. said, "oh well, we'll see about her returning in August – if she returns" and rolled her eyes.

162.    M.B. was subsequently promoted to senior manager.

163.    She also reported a subordinate surgeon's experience with sexism/harassment from a male orthopedic surgery colleague.

164.    The harassment involved a senior surgeon/faculty member, Dr. H, against Dr. Mount's mentee, Dr. J. L.   It constituted inappropriately demeaning, angry behavior in the operating room, and then subsequent angry, unprofessional text messages.

165.    Dr. Mount perceived this as gender-specific, given how Dr. H treated male colleagues.

166.    Dr. Mount reported it to Dr. David Yu, Surgeon in Chief. The first thing Dr. Yu said was "again?" Dr. Yu knew who she was talking about even before Dr. Mount mentioned Dr. H's name. During this discussion, Dr. Mount was told that this behavior had happened in the past, and he was well-known for the misbehavior.

167.    Specifically, on approximately November 17, 2023, Dr. Mount met with Dr. David Yu, Surgeon in Chief, and Dr. Tony Gonzales, Service Line Chief of Orthopedic Surgery, in a private meeting in Dr. Yu's office.

168.    During the November meeting, Dr. Mount was informed this senior surgeon had undergone a PIP and "talking to" after this identical behavior in the past, but that the matter was

dropped and he was allowed to remain credentialed in good standing at CHNOLA.  Dr. Yu told Dr. Mount to "just let it go."

169.    Dr. Mount reported the matter formally, and directed Dr. J.L. to make a BE SAFE report for the record.

170.    A range of senior leaders were aware of Dr. Mount's reporting of this, including Dr. Mark Kline, Senior Vice-President, Chief Medical Officer and Physician-in-Chief at CHNOLA, as well as members of the review committee and human resources.

171.    After reporting these two issues, Dr. Mount found that the C-suite executives' treatment of her changed: her emails more frequently went unanswered, her proposed initiatives were ignored, meetings were more frequently canceled, they were colder towards Dr. Mount when they spoke to her, and responsibilities were shifted to Dr. Masoumy.

172.    In particular, one senior doctor canceled a meeting with Dr. Mount because he was in surgery – but when Dr. Mount checked, he had no surgery scheduled.

173.    This shift indicated to Dr. Mount that the leadership were preparing to remove her after her reporting of discrimination.

174.    That came to pass: seven weeks after reporting Dr. H's conduct, on January 8, 2024, Dr. Mount was told she would be terminated.

175.    Regarding pay, during certain periods of Dr. Mount's employment, Defendants paid her less than a younger, male junior colleague, whom she was mentoring and had significantly less expertise and experience.

176.    Dr. Mount received her Doctor of Medicine in 1992 and completed her clinical fellowship in 2001.

177.    Dr. Masoumy received his Doctor of Medicine in 2009 and completed his clinical fellowship in 2019.

178.    In FY 2023, Dr. Mount made $554,800.

179.    In FY 2023, Dr. Masoumy made $615,982.67.

180.    That is a discrepancy of $61,182.67.

181.    That is almost *precisely* the gender-based pay discrepancy described in the Muslow suit. In that suit, Muslow's salary was a little more than $182,400. A man in the chancellor's office with a position two grades below Muslow was paid $61,200 more annually than Muslow, the lawsuit alleges.

182.    Defendants have argued that the pay discrepancy between Dr. Mount and Dr. Masoumy was due to "RVU performance" measures, suggesting that Dr. Mount was simply not working as hard as Dr. Masoumy.

183.    This explanation itself reflects false and prejudiced gender stereotypes.

184.    In reality, the difference in recorded RVUs was driven by Defendants' choices.

185.    For example, Dr. Mount's contract was structured such that only 80% of her time was supposed to be spent on clinical work, with the remainder on administrative work.

186.    Furthermore, CHNOLA's billing (RVU capture) was chaotic: some of Dr. Mount's cases were more than six months behind in reporting, which resulted in her RVU numbers appearing lower than they actually were.

187.    In sum: Defendants' RVU argument is a mere pretext for discrimination.

188.    The gender discrimination was corroborated by other unequal treatment associated with gender. For example, Dr. Mount was placed in a separate building than the male service line chiefs – and then higher-ups complained that she was not "seen" enough. When additional faculty joined the group at CHNOLA, Dr. Mount was required to share an office with the new female faculty member, while male faculty members (Masoumy, Fulton and King) retained their

individual, private offices. Dr. Mount also observed a clear difference in how receptive the CHNOLA and LSUHSC leadership were to new initiatives proposed by female versus male chiefs.

189.    Each Defendant has had more than 500 employees at all relevant times.

190.    Defendants acted with malice or with reckless indifference to the federally protected rights of Dr. Mount.

191.    Defendants are liable for the acts and/or omissions of their agents and employees. Defendants, either directly, or by and through their agents, directly and proximately caused Plaintiff's severe injuries, damages, and losses.

192.    As a result of Defendants' misconduct, Plaintiff has suffered damages, including but not limited to, lost past income, compensation, and benefits, along with substantial non-monetary damages, and has incurred attorney's fees and costs.[23]

### Count 2: Equal Pay Act
### *Against all Defendants*

193.    Dr. Mount incorporates by reference all other paragraphs of this Complaint as if fully set forth here.

194.    The Equal Pay Act prohibits discrimination in compensation on the basis of sex.[24]

195.    As described in Count 1, Defendants discriminated against Plaintiff in their pay in violation of the EPA.  Between July 3, 2022 and July 9, 2024, Defendants paid Plaintiff, and/or directed that Plaintiff be paid, less than similarly situated male employees performing equal work on jobs the performance of which require equal skill, effort and responsibility and which were performed under similar working conditions, including Dr. Mohamad Masoumy.

---

[23] With respect to Dr. Mount's pay discrimination claims under Title VII, she seeks monetary damages dating back to 300 days prior to the filing of her EEOC charge.
[24] 29 U.S.C. § 206(d)(1).

196.    The differential in pay between Plaintiff and similarly-situated male employees was not due to any (i) a seniority system; (ii) a merit system; (iii) a system of earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.

197.    Defendants did not act in good faith and created and perpetuated gender-based wage discrimination in violation of the EPA.

198.    The adverse actions taken against Plaintiff were discriminatory, and were motivated by her gender status and animus.

199.    These violations of the EPA were willful, show a reckless disregard for Plaintiff's protected rights under the EPA, and constitute a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a).

200.    As a result of Defendants' violations of the EPA, Plaintiff has suffered damages, including but not limited to, lost past income, compensation, and benefits and has incurred attorney's fees and costs.[25]

201.    Defendants are liable for the acts and/or omissions of their agents and employees. Defendants, either directly, or by and through their agents, directly and proximately caused Plaintiff's severe injuries, damages, and losses.

202.    These violations of the EPA were willful, and show a reckless disregard for Plaintiff's protected rights under the EPA.

**Count 3: Americans With Disabilities Amendments Act,**
**Rehabilitation Act, and Louisiana Human Rights Act**
***ADAA and LHRA claims against CHNOLA only; Rehabilitation Act against all Defendants***

203.    Dr. Mount incorporates by reference all other paragraphs of this Complaint as if fully set forth here.

---

[25] With respect to Plaintiff's EPA claim, she seeks monetary damages dating back to July 3, 2022.

204.    The Americans with Disabilities Amendments Act (ADAA) makes it illegal to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S. Code § 12112.

205.    A disability under the ADAA is "an impairment that substantially limits one or more major life activities, a record of such an impairment, or being regarded as having a disability." 42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2(g).

206.    The ADAA states that "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."[26] Major life activities also include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions."[27]

207.    When engaging with an employee's disability, an employer is obligated to engage in an interactive process with the employee that identifies the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.[28] This interactive process is mandatory.[29]

208.    Similar requirements apply under the Louisiana Human Rights Act and the federal Rehabilitation Act as well.

---

[26] 42 U.S. Code § 12102(2)(A).
[27] 42 U.S. Code § 12102(2)(B).
[28] 29 C.F.R. § 1630.2(o)(3).
[29] *Stokes v. Nielsen*, 751 Fed. Appx. 451, 455 (5th Cir. Oct. 8, 2018).

209.    Here, during her employment with Defendants, Dr. Mount experienced spinal issues that caused insensate foot and intermittent dropfoot, resulting in impacts to her standing and walking.

210.    Dr. Mount also experienced migraines, resulting in impacts to her seeing, concentrating, working, etc.

211.    Dr. Mount does not consider herself to be or have been a person with a disability.

212.    But given the impacts to her major life activities of standing, walking, etc., during the period of her spinal issues and migraines she met the legal criteria for a person with a temporary disability under the ADAA.

213.    Furthermore, whether or not she was a person with a disability, Defendants regarded her as disabled – which is equally protected under the ADAA.

214.    Weeks after Defendants learned of Dr. Mount's medical conditions and need for surgery and three days after Defendants approved Dr. Mount for leave related to her disability or perceived disability, Defendants told her that they would not be renewing her contract.

215.    They did not engage in any interactive process of seeking any accommodation whatsoever.

216.    Then, on the very day Dr. Mount told her employers that she was going to be cleared to return to work in April, Defendants wrote to Dr. Mount to tell her that she was being placed on administrative leave with no return date before the end of her contract.

217.    They gave no explanation other than that they "wanted to give [her] enough recovery time."

218.    Defendants' email that they were placing Dr. Mount on non-consensual administrative leave because they "wanted to give [her] enough recovery time" is strong evidence of regarded-as disability discrimination.

219.    Even if Defendants were motivated by genuine desire to aid Dr. Mount's recovery, their actions were still illegal.

220.    That is because "discrimination" under the ADA and Rehabilitation Act "differs from discrimination in the constitutional sense because the ADA and Rehabilitation Act statutes contain their own definitions of discrimination."[30] "The key distinction is that '[d]iscrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect.'"[31]

221.    Thus, the "intentional discrimination" requirement found other anti-discrimination statutes, like Title VI, "does not translate well into cases such as this one where the alleged discrimination is not 'intentional' in the usual sense of the word."[32]

222.    Furthermore, if Defendants are taken at their word that they applied a rigid RVU-based scheme for compensation, that would violate the disability discrimination statutes as well, given that it made no accommodation for the impacts of a disability and punished Dr. Mount for taking time off to recover from disability-related surgery.

223.    Also, to the extent that Defendants fired Dr. Mount because she rescheduled two surgeries and some clinic appointments in 2023, that would also be disability discrimination – because the rescheduling was caused by migraine onset.

224.    Defendants engaged in no interactive process of seeking accommodation with regard to Dr. Mount's migraines.

225.    Defendants are recipients of federal funds.

---

[30] *McCoy v. Tex. Dep't of Crim. Justice*, 2006 WL 2331055, *22 (S.D. Tex. 2006) (citing *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 672 (5th Cir. 2004)).
[31] *Justice v. Pendleton Place Apartments,* 40 F.3d 139, 144 n.6 (6th Cir. 1994) (citing *Alexander v. Choate*, 469 U.S. 287, 295 n.11 (1985)).
[32] *Justice*, 40 F.3d at 144 n.6.

226.    The adverse actions taken against Plaintiff were discriminatory, and were motivated by her disability status and animus.

227.    Defendants are liable for the acts and/or omissions of their agents and employees. Defendants, either directly, or by and through their agents, directly and proximately caused Plaintiff's severe injuries, damages, and losses.

228.    As a result of Defendants' misconduct, Plaintiff has suffered damages, including but not limited to, lost past income, compensation, and benefits, along with substantial non-monetary damages, and has incurred attorney's fees and costs.

<u>**Count 4: Age Discrimination in Employment Act**</u>
*Against Defendant CHNOLA*

229.    Dr. Mount incorporates by reference all other paragraphs of this Complaint as if fully set forth here.

230.    The Age Discrimination in Employment Act of 1967 (ADEA) makes it unlawful to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" or to "limit, segregate, or classify . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age." 29 U.S.C. § 623(a).

231.    Here, Dr. Mount was born in 1964.

232.    In 2023, Dr. Mount was 57 years old.

233.    In FY 2023, Defendants paid Dr. Masoumy more than $61,000 more than Dr. Mount.

234.    Also in 2023, Defendants promoted Dr. Masoumy over Dr. Mount, despite Dr. Masoumy being much younger and having eighteen fewer years of medical experience.

235.    Defendants did not even allow Dr. Mount to apply for the promotion.

236.    Then, once Defendants learned that Dr. Mount had health issues, Defendants terminated her contract and placed her on administrative leave.

237.    The adverse actions that Defendants took against Plaintiff were discriminatory, and were motivated by her age and animus against that characteristic.

238.    Defendant CHNOLA is liable for the acts and/or omissions of agents and employees. Defendant, either directly, or by and through agents, directly and proximately caused Plaintiff's severe injuries, damages, and losses.

239.    As a result of Defendant's violation of the ADEA, Plaintiff has suffered damages, including but not limited to lost past income, compensation, and benefits, and has incurred attorney's fees and costs.

## Count 5: Family & Medical Leave Act
### *Against CHNOLA Only*

240.    Dr. Mount incorporates by reference all other paragraphs of this Complaint as if fully set forth here.

241.    Plaintiff was an eligible employee as defined by the Family Medical Leave Act ("FMLA") at all relevant times to this Complaint and was entitled to a total of 12 workweeks of leave during any 12-month period because of "a serious health condition that makes the employee unable to perform the functions of the position of such employee."[33]

242.    Plaintiff was entitled to the protections of the FMLA as her employers, Defendants, had over fifty employees within 75 miles.[34]

243.    The FMLA makes it unlawful for "any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this title … [or] to discharge or

---

[33] 29 U.S.C. § 2612(a)(1)(D).
[34] *See* 29 U.S.C. § 2611(4).

in any other manner discriminate against any individual for opposing any practice made unlawful by this title." 29 U.S.C. § 2615.

244.    Under the FMLA, an employee is generally entitled to be reinstated to the same position or an equivalent position after FMLA leave.[35]

245.    Here, within days of Dr. Mount being approved for FMLA leave, she was informed her that her emploeyrs would not be renewing her contract.

246.    Then, when she expressed that she was cleared to return to work, Defendants prevented her reinstatement to her position by placing her on administrative leave.

247.    Defendants' conduct – not renewing Dr. Mount's contract and placing her on administrative leave – violated the FMLA, both under a retaliation framework and under a right-to-return framework.

248.    Defendant CHNOLA is liable for the acts and/or omissions of their agents and employees. Defendant, either directly, or by and through agents, directly and proximately caused Plaintiff's severe injuries, damages, and losses.

249.    Defendant did not act in good faith as to any FMLA violations alleged herein.

250.    As a result of Defendant's violations of the FMLA, Plaintiff has suffered damages, including but not limited to lost past income, compensation, and benefits and has incurred attorney's fees and costs.

## <u>Count 6: Breach of Implied Covenant of Good Faith and Fair Dealing</u>
### *Against CHNOLA Only*

251.    Dr. Mount incorporates by reference all other paragraphs of this Complaint as if fully set forth here.

---

[35] 29 U.S.C. § 2614(a)(1).

252.    There is an implied covenant of good faith and fair dealing in every contract in Louisiana.[36]

253.    Defendant CHNOLA failed to engage in good faith and fair dealing by luring her away from Wisconsin and then engaging in discriminatory pay practices.

254.    Defendant is liable for the acts and/or omissions of its agents and employees. Defendant, either directly, or by and through agents, directly and proximately caused Plaintiff's severe injuries, damages, and losses.

255.    Defendant also failed to engage in good faith and fair dealing in regard to Plaintiff's employment contract by terminating her contract once she was approved for FMLA and placing her on administrative leave when she was cleared to return.

## RELIEF REQUESTED

256.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all questions of fact raised by the complaint.

257.    Plaintiff states any and all other causes of action that may become known through a trial of this matter on its merits against any and all other parties which are herein named or which may be added later, and requests any and all other damages or remedies which this Court may seem equitable.

258.    Plaintiff reserves the right to notice of defect to this pleading and reserves the right to amend or supplement this Complaint after discovery of any additional fact, law, or claim, the amendment of which to be performed by the filing of any subsequent pleading.

---

[36] See *Bonanza International, Inc. v. Restaurant Management Consultants, Inc.*, 625 F. Supp. 1431, 1445 (E.D.La. 1986); *Grisaffi v. Dillard Dep't Stores, Inc.*, 43 F.3d 982, 983 (5th Cir. 1995); *Brill v. Catfish Shaks of America, Inc.*, 727 F. Supp. 1035, 1039 (E.D.La. 1989).

259.    Wherefore Plaintiffs request judgment be entered against Defendants and that the

Court grant the following as appropriate:

    A.  For a judgment against Defendants for all asserted causes of action;

    B.  For a judgment awarding compensatory and special damages;

    C.  For a judgment awarding front and back pay;

    D.  For a judgment awarding Plaintiff her costs and attorney's fees;

    E.  For a judgment awarding punitive damages (against CHNOLA only);

    F.  For a judgment awarding liquidated damages under the relevant statutes;

    G.  For a declaratory judgment against Defendants for violations of the Family

       Medical Leave Act;

    H.  For a judgment awarding pre- and post-judgment interest at the highest rates

       allowed by law; and

    I.  For all other and further relief as may be necessary and appropriate.

Respectfully Submitted:

*/s/ William Most*
WILLIAM MOST, T.A. (La. Bar No. 36914)
DAVID LANSER (La. Bar No. 37764)
Most & Associates
201 St. Charles Ave., Ste. 2500, # 9685
New Orleans, LA 70170
Tel: (504) 509-5023
williammost@gmail.com
davidlanser@gmail.com

KERRY A. MURPHY (La. Bar No. 31382)
Kerry Murphy Law LLC
201 St. Charles Ave., Suite 2500, #1824
New Orleans, LA 70170
Telephone: (504) 603-1502
Facsimile: (504) 603-1503
Email: kmurphy@kerrymurphylaw.com

***Attorneys for Plaintiff, Dr. Delora Mount***