UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| Dr. DELORA MOUNT | CIVIL ACTION No. 25-1377 |
| VERSUS | JUDGE: SARAH S. VANCE |
| LOUISIANA STATE UNIVERSITY HEALTH SCIENCES CENTER, et al. | MAGISTRATE JUDGE: KAREN WELLS ROBY |

**PLAINTIFF'S OPPOSITION
TO DEFENDANTS' SECOND PARTIAL MOTIONS TO DISMISS**

Plaintiff Dr. Delora Mount respectfully submits this memorandum in opposition to Defendants' second set of partial motions to dismiss (R. Docs. 25 and 26).

### Introduction and Factual Background

Plaintiff Dr. Delora Mount is a national expert in craniofacial and pediatric plastic surgery. R. Doc. 24 at ¶ 1 and 21. She specializes in the repair of birth defects and other facial abnormalities in children and infants. *Id.*

In 2021, LCMC recruited Dr. Mount to move from the University of Wisconsin to Louisiana to work at Children's Hospital New Orleans. *Id.* at ¶¶ 2, 25. It asked Dr. Mount to serve in a dual role: an administrative role as Section Chief of Pediatric Plastic Surgery at Children's Hospital and a clinical role as a surgeon with faculty duties at LSUHSC. *Id.* at ¶ 2.

In 2022, Dr. Mount moved to New Orleans and began her new job. *Id.* at ¶¶ 2, 25. After that point, the problems began. For example, Defendants hired Dr. Mount in part to mentor a younger, male surgeon. But Dr. Mount learned that in FY 2023, Defendants paid the younger male surgeon $61,000 *more* than Dr. Mount – even though he had eighteen-years' *less* experience. *Id.* at ¶¶ 2, 4, 5.

1

Then, in the summer of 2023, Dr. Mount injured her wrist during a fall caused by an ongoing herniated disc and nerve compression in her leg. R. Doc. 24 at ¶ 6. The wrist injury required surgery to repair, and the underlying spinal issue required another surgery and medical leave. *Id.*

In the winter of 2023, Dr. Mount reported that a senior surgeon had harassed a female subordinate and engaged in differential behavior based on gender. *Id.* at ¶ 164-165. During a November 17, 2023 meeting, Dr. Mount was told that the surgeon had done this before – but that Dr. Mount should "just let it go." *Id.* at ¶ 168. After this point, Dr. Mount found that the C-suite executives' treatment of her changed: her emails more frequently went unanswered, her proposed initiatives were ignored, meetings were more frequently canceled, they were colder towards Dr. Mount when they spoke to her, and responsibilities were shifted to Dr. Masoumy. *Id.* at ¶ 171.

On January 5, 2024, Defendants approved Dr. Mount for FMLA leave for her final surgery. *Id.* at ¶ 7. <u>Three days later</u>, on January 8, 2024, Dr. Mount was handed a dismissal letter, saying that "you are hereby given notice that your appointment will not be renewed" and that her last day of work would be July 9, 2024. *Id.*

But Defendants would not let her go back to work at all. On March 17, 2024, Dr. Mount updated her employers that she was going to be cleared to return to work in April. *Id.* at ¶ 8. That same day, Defendants emailed Dr. Mount to tell her that she was being placed on administrative leave with no return date before the end of her contract. *Id.* They gave no explanation other than that they "wanted to give [her] enough recovery time." *Id.*

After Defendants fired her, Dr. Mount found a position as a surgeon and professor at the UNC School of Medicine in North Carolina. *Id.* at ¶ 11. But because of her termination, there is

only one doctor in the entire state of Louisiana who offers certain kinds of reconstructive surgery for children.[1] *Id.* at ¶ 12.

Altogether, the facts tell a cohesive story: Defendants hired Dr. Mount to burnish their program and to train a younger, male doctor who showed promise. But when Dr. Mount showed that she would not turn a blind eye to gender disparities and harassment, and when she was injured and required significant surgery and medical leave herself, Defendants decided she was not worth the hassle – and fired her.

On July 3, 2025, Dr. Mount filed suit, bringing a range of federal and claims involving gender, age, and disability discrimination, pay equity, FMLA violations, and breach of implied contractual covenants. R. Doc. 1.

Defendants responded with two partial motions to dismiss (R. Docs. 8 and 11), seeking to dismiss some of Plaintiff's claims and forms of relief. Relevant here, the Court pointed to deficiencies in Plaintiff's factual allegations related to her implied covenant of good faith and Title VII claims, and dismissed those claims without prejudice. R. Doc. 19. The Court granted Plaintiff leave to amend the complaint. *Id.* Plaintiff did so. R. Doc. 24.

## Legal Standard

Dismissal under Rule 12(b)(6) is disfavored and rarely granted. *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982). Under the 12(b)(6) standard, all well-pleaded facts must be viewed in the light most favorable to the plaintiff. *Hale v. King*, 642 F.3d 492, 498-99 (5th Cir. 2011) (*en banc*). Plaintiffs must allege facts that support the elements of the cause of action in order to make out a valid claim. *Id.* Courts generally confine their analysis

---

[1] *See* https://www.lsuprsresidency.com/faculty ("presently the only reconstructive surgeon to offer microtia reconstruction in the entire state of Louisiana.").

under Rule 12(b)(6) to the complaint and its proper attachments, which "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Id.*, *quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The well-pleaded facts must permit the court to infer more than the mere possibility of misconduct. *Id.*

## Legal Analysis

**A.   The Court should deny LCMC's motion regarding the implied covenant because the Amended Complaint details dozens of factual allegations that make the existence of an oral contract more than plausible.**

In ruling on the first set of motions to dismiss, this Court dismissed without prejudice Dr. Mount's claim against LCMC for violation of the implied covenant of good faith and fair dealing. R. Doc. 19 at 11-13, 16. The Court reasoned that Dr. Mount's complaint did not contain an explicit allegation of an oral contract between Plaintiff and LCMC. *Id.* And the Court also reasoned that she had not provided authority for the proposition that the joint/dual employer or borrowed servant doctrines create a contractual duty in the absence of an oral or written contract. *Id.*

In the amended complaint, Dr. Mount now explicitly alleges that "LCMC Health, through CHNOLA, had an oral agreement with Plaintiff to work as a physician at the Children's Hospital in exchange for pay." R. Doc. 24 at ¶ 41. She bolsters the plausibility of that allegation with a range of facts, including that:

- LCMC "was the entity that recruited Dr. Mount" (¶ 43);
- LCMC "undertook all of Dr. Mount's recruitment and recruitment expenses" (¶ 44);
- LCMC "made all communications with Dr. Mount about the hire (email, phone calls, card from CEO welcoming her as a new hire)" (¶ 45);

4

- LCMC "paid for all of Dr. Mount's recruitment-related hotels, hospitality, and air travel" (¶ 46);

- LCMC "negotiated Dr. Mount's signing bonus" (¶ 47);

- LCMC leaders "specifically the Surgeon-in-Chief, Dr. Ellis Arjmand, who reported to Lou Fragoso (CFO) and John Nikkens (CEO), were the primary decision-makers in Dr. Mount's hiring and handled and all salary negotiations" (¶ 50);

- LSUHSC did not participate in the "conversations or input in Dr. Mount's hiring" (¶ 51);

- LCMC "retained supervision and control over the doctors" (¶ 54);

- Plaintiff "never received hospital credentials for other LSU affiliates" but "could only operate and see clinical patients" through LCMC or its affiliate in Baton Rouge (¶ 55, xxviii);

Plaintiff also alleges that "LCMC Health controlled many aspects of Dr. Mount's job", including twenty-four specific examples, such as number of clinics per week, a mandated grid of appointment times, office space, pay calculations, badge access, training, billing requirements, etc. ¶ 55, i-xxiv. Plaintiff also included an image of the $30,000.00 signing bonus that LCMC paid directly to Plaintiff (¶ 48):



Of all these facts, the only one LCMC addresses is the signing bonus – and only to say, without explanation, that the allegation is "false[.]" R. Doc. 26-1 at 4. In so doing, LCMC entirely ignores the standard applicable to its motion to dismiss—that all facts are to be viewed in the light

most favorable to the plaintiff. Further, LCMC waves away all the rest of the allegations as only related to the joint/dual/borrowed servant. *Id.* But that misunderstands the relevance of these facts. They both support a joint/dual/borrowed servant *and also* bolster the plausibility of the oral contract. *See Herc Rentals, Inc. v. Cmty. Constr. Co., LLC.*, No. 3:23-CV-270-HTW-LGI, 2025 LX 145275, at *9 (S.D. Miss. Mar. 19, 2025) (holding that allegations related to course of dealing, possession, and compliance with payment obligations were "sufficient to establish a plausible claim for the existence of an enforceable contract").

LCMC offers no argument for why all these facts, particularly when taken together and viewed in the light most favorable to Plaintiff as is required, do not make it at least plausible that Dr. Mount had an oral contract with LCMC sufficient to clear the "low threshold" of *Iqbal/Twombly. See Wooten v. McDonald Transit Assocs.*, 788 F.3d 490, 494 (5th Cir. 2015). Indeed, LCMC offers no explanation whatsoever for why it recruited Dr. Mount, directed Dr. Mount's work, and paid a signing bonus to Dr. Mount directly – if it did not have any sort of contract with her.

If, however, all of that is insufficient, Dr. Mount respectfully asks for leave to amend her complaint to incorporate additional facts, including from documents produced in discovery. For example, LCMC recently turned over a document admitting that it made "commitments" to Dr. Mount including the $30,000 bonus and "[s]alary support of $550,000 annually paid by Children's Hospital to LSU." Ex. A. LCMC concedes in the document that these commitments are in "addition to your offer letter from Dr. Batson on behalf of LSU." *Id.* (emphasis added). There is a word for an explicit, written, standalone "commitment" to pay someone money for their work. That word is "contract."

6

LCMC's motion with regard to the implied covenant should be denied. In the alternative, Plaintiff respectfully requests leave to amend.

**C.     The Court should deny Defendants' motions regarding Title VII retaliation because the amended complaint clarifies the causal link between protected activity and adverse action and properly pleads a Title VII retaliation claim.**

In reviewing the original complaint, this Court found that Dr. Mount sufficiently alleged that she "engaged in protected activity" when she alleged "that she reported inappropriate behavior, including comments regarding a colleague's taking maternity leave, during a July 2023 performance review of a subordinate, and that she reported another surgeon's experience with sexism and harassment from a male surgery colleague." R. Doc. 19 at 8. The Court also found that Dr. Mount's allegations about denied promotions, leave, and termination adequately alleged "that she suffered a materially adverse action." *Id.* at 9.

But the Court found that Dr. Mount had not sufficiently alleged facts to show the causal link between her protected activity and the adverse actions, such as "when and to whom she reported her colleague's experience with sexism and harassment." *Id.* at 10. And the Court found that the four-to-five-month gap between the protected activity and the adverse actions was "not close enough in time to, without more, plausibly show causation for retaliation purposes." *Id.*

In her amended complaint, Dr. Mount fills in the details the Court found lacking. In paragraphs 158 to 174, she details her reporting of disparaging, gender-based comments to Sonia Carter, the Director of Ambulatory and Social Services on July 17, 2023 and to Dr. David Yu, Surgeon in Chief, on November 17, 2023. She details how a senior leader told her to "just let it go," but she nevertheless "reported the matter formally, and directed Dr. J.L. to make a BE SAFE report for the record." R. Doc. 24 at ¶¶ 168-169.

She also details the range of senior leaders who were aware of Dr. Mount's reporting of this, "including Dr. Mark Kline, Senior Vice-President, Chief Medical Officer and Physician-in-Chief at CHNOLA, as well as members of the review committee and human resources." R. Doc. 24 at ¶ 170.

With these additional details, it becomes clearer that the relevant period is not four or five-months, but rather fewer than seven weeks. *Compare id.* at ¶ 167 (Nov. 17, 2023 reporting meeting) with ¶ 174 ("seven weeks after reporting Dr. H's conduct, on January 8, 2024, Dr. Mount was told she would be terminated."). That falls squarely within the temporal proximity that this Court noted the Fifth Circuit had endorsed. R. Doc. 19 at 10-11, *citing Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 578 (5th Cir. 2020) (noting that the Fifth Circuit has previously held that a period of two-and-a-half months, a period of two months, and a period of six-and-a-half weeks between the protected act and adverse employment action "are close enough to show a causal connection" in holding that such events "must be very close in time to establish causation by timing alone"). Here, the events alleged in the amended complaint—protected activity occurring through mid-November and nonrenewal occurring in early January—are sufficiently close in time to on their own show a causal connection as required for a retaliation claim.

But Dr. Mount's amended complaint goes further, also providing more contextual details such that the timing is not the *only* evidence of the causal link between protected activity and adverse action. For example, she explains that after "reporting these two issues, Dr. Mount found that the C-suite executives' treatment of her changed: her emails more frequently went unanswered, her proposed initiatives were ignored, meetings were more frequently canceled, they were colder towards Dr. Mount when they spoke to her, and responsibilities were shifted to Dr.

Masoumy." R. Doc. 24 at ¶ 171. She noticed that senior officials began inventing pretexts to avoid her. For example, "one senior doctor canceled a meeting with Dr. Mount because he was in surgery – but when Dr. Mount checked, he had no surgery scheduled." *Id.* at ¶ 172. LSUHSC contends that these actions "do not constitute materially adverse actions." R. Doc. 25-1 at 5. But Plaintiff does not allege that they do; instead, these facts – and their timing – make more plausible that the *actual* adverse actions were connected to her reporting of misconduct. When these alleged facts are viewed in the light most favorable to Plaintiff, they support a finding of causation between Plaintiff's legally protected activity and the adverse actions taken against her – and plausibly allege a retaliation claim.

LSUHSC also argues that "Plaintiff does not allege that any LSUHSC official" had knowledge of her complaints. R. Doc. 25-1. But that is incorrect and ignores specific allegations in the amended complaint—that Plaintiff discussed her complaints with Dr. David Yu, Surgeon in Chief, and Dr. Tony Gonzales, Service Line Chief of Orthopedic Surgery (R. Doc. 24 at ¶ 167), both of whom are or were LSUHSC faculty members.[2]

LCMC also argues that it is not clear that the November 17, 2023 meeting was about Dr. Mount's report of misconduct. R. Doc. 26-1 at 6. But it could hardly be clearer: Dr. Mount alleges that during that meeting, they talked about this surgeon's "identical behavior in the past" and that Dr. Yu told Dr. Mount to "just let it go." *Id.* at ¶ 168. Moreover, by critiquing the clarity of Plaintiff's protected activity allegations, LCMC again disregards the requirement that the facts are to be viewed in the light most favorable to the Plaintiff.

---

[2] *See* https://www.medschool.lsuhsc.edu/ortho/faculty.aspx (listing Dr. Gonzales on the LSUHSC faculty).

Both Defendants also argue that it is "unclear" whether Dr. Mount's complaint about the surgeon "rises to the level of protected activity under Title VII." R. Doc. 26-1 at 7; R. Doc. 25-1 at 4. But this Court already determined—based Plaintiff's allegations in the original complaint, which have been retained in the amended complaint—that it does. *See* R. Doc. 19 at 8 (holding that Plaintiff sufficiently alleged that she "engaged in protected activity"). Given that Defendants did not move for reconsideration of that order or even attempted to cite any reason why it was wrong, Defendants' motions should be denied and Plaintiff's Title VII retaliation claim should proceed.

## Conclusion

For the reasons set forth herein, Defendants' motions to dismiss should be denied. Or in the alternative, she should be allowed to amend her complaint to include additional allegations regarding LCMC's explicit commitments of paying Dr. Mount for her work.

Respectfully Submitted:

*/s/ William Most*
WILLIAM MOST, T.A. (La. Bar No. 36914)
DAVID LANSER (La. Bar No. 37764)
Most & Associates
201 St. Charles Ave., Ste. 2500, # 9685
New Orleans, LA 70170
Tel: (504) 509-5023
williammost@gmail.com
davidlanser@gmail.com

KERRY A. MURPHY (La. Bar No. 31382)
Kerry Murphy Law LLC
201 St. Charles Ave., Suite 2500
New Orleans, LA 70170
Telephone: (504) 603-1502
Facsimile: (504) 603-1503
Email: kmurphy@kerrymurphylaw.com

***Attorneys for Plaintiff, Dr. Delora Mount***